**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **INPWR INC.** | : | **CASE NO.  2:21-CV-00821** |
| **VERSUS** | : | **JUDGE TERRY A. DOUGHTY** |
| **OLSON RESTORATION L L C ET AL** | : | **MAGISTRATE JUDGE KAY** |

**REPORT AND RECOMMENDATION**

Before the court are two motions to dismiss filed by third-party defendants, DCMC, LLC a/k/a DCMC Partners ("DCMC") and the Lemoine Company, LLC ("Lemoine") Docs. 129, 134. The motions are filed pursuant to Federal Rule of Civil Procedure 12(b)(6) and seek dismissal of third-party claims filed by Expedited Service Partners, LLC ("ESP").  *Id.*  ESP opposes the motions.  Docs. 137, 154.  DCMC and Lemoine have replied [docs. 144, 159], and the court has granted leave for ESP to file sur-replies [docs. 150, 161].  The matter is now ripe for resolution.

This matter has been referred to the undersigned for review, report, and recommendation in accordance with the provisions of 28 U.S.C. § 636.  For reasons stated below, it is

**RECOMMENDED** that Lemoine's Motion to Dismiss [doc. 134] be **DENIED**;

**IT IS FURTHER RECOMMENDED** that DCMC's Motion to Dismiss [doc. 129] be **GRANTED IN PART** such that Counts One and Two ("Intentional Tort" and "Negligent Professional Undertaking") of ESP's third party demand as to DCMC be dismissed with prejudice;

**IT IS FURTHER RECOMMENDED** that DCMC's Motion to Dismiss [doc. 129] be otherwise **DENIED.**

# I.
## BACKGROUND

This matter began as a suit filed by InPwr, Inc. ("InPwr") against Olson Restoration, LLC, d/b/a Servpro Disaster Recovery Team Olson ("ServPro"), Southwest Louisiana Hospital Association d/b/a Lake Charles Memorial Hospital ("LCMH"), and ESP. [1] Doc. 1. In the factual background of its complaint, InPwr notes that substantial damage was caused throughout Southwest Louisiana because of the landfall of Hurricane Laura on August 27, 2020, necessitating extensive restoration and recovery work on LCMH's buildings (the "LCMH Project"). *Id.*, ¶¶ 5-12. The heart of InPwr's complaint is the allegation that it was not fully compensated for the services it provided for the LCMH Project. Doc. 1.

Defendant and third-party plaintiff ESP is a subcontractor who provided emergency power generation equipment for the LCMH Project. Doc. 113, p. 2, ¶ 5. In its third-party demand, ESP alleges that ServPro acted in the capacity of general contractor[2] for the LCMH Project, and that ServPro subcontracted with InPwr to provide services for the LCMH Project including emergency power generation. *Id.*, p. 4, ¶ 18-20. InPwr, in turn, leased equipment from ESP for the LCMH Project. *Id.*, p. 4, ¶ 20-21. ESP also contracted directly with ServPro. *Id.* ESP alleges that, despite fulfilling the terms of its contracts with ServPro and InPwr, ESP was never paid for its services and is owed a total of $6.9 million plus contractual interest. *Id.*, p. 5, ¶ 24-28.

---

[1] InPwr alleges that this court enjoys diversity jurisdiction pursuant to 28 U.S.C. § 1332 in that "this is a civil action between citizens of different states and the amount in controversy exceeds Seventy-Five Thousand and 00/100 ($75,000) Dollars." Doc. 1, p. 2. By Report and Recommendation, we suggested to the district court that it determine we do enjoy subject matter jurisdiction, and the recommendation has been adopted by the district court. Docs. 142, 155.

[2] The court makes no finding as to whether ServPro served as general contractor, which may be relevant to other motions currently pending in this matter, but merely repeats the allegations of ESP's third-party demand.

ESP filed a third-party demand against two entities it alleges share the fault for the non-payment of its services:  Lemoine and DCMC.  Doc. 113.  Via the motions now before the court, Lemoine and DCMC test the adequacy of ESP's allegations against them.

### A. ESP's third-party claims against Lemoine

According to the allegations of ESP's third-party demand, LCMH hired Lemoine as project manager for the LCMH project.  *Id.*, p. 6, ¶ 33.  ESP alleges that Lemoine met with and directed general contractor ServPro's work on the LCMH Project; ESP also alleges that Lemoine's role included generating cost savings for LCMH at the expense of ServPro's and downstream vendors' bottom lines.  *Id.*, p. 9-11, ¶ 47, 56-59.  ESP alleges that Lemoine undertook its role via inexperienced personnel who used flawed assumptions and issued arbitrary or ill-conceived directives advising LCMH not to pay certain invoices, including ESP's invoices (which were submitted by ServPro).  *Id.*, p. 9-11, ¶ 48, 56-60.  Lemoine's alleged motive for doing so was to justify its own contract price.  *Id.*

ESP alleges that LCMH engaged Lemoine while LCMH was still negotiating its rates with ServPro, and LCMH gave Lemoine the task of reviewing the proposed service agreement and rate sheets that ServPro provided to LCMH.  *Id.*, p. 7-8, ¶ 34-37.  At that point, work on the LCMH project was already underway.  ESP alleges that Lemoine knew by September 2020 that the cost of the LCMH Project would exceed LCMH's insurance recovery [*id.*, p. 7, ¶ 36-39] and that, instead of advising LCMH to "demobilize" the subcontractors working on the LCMH Project, Lemoine simultaneously encouraged ServPro to believe a contract would be finalized while simultaneously cautioning LCMH not to finalize it.  *Id.*, p. 9-10, ¶ 45-53, 60, 67.

ESP alleges that Lemoine is responsible to ESP for ESP's damages under the following theories:

**COUNT ONE: NEGLIGENT PROFESSIONAL UNDERTAKING.**
Because Lemoine was tasked with reviewing LCMH Project invoices, ESP
reasons that Lemoine owed ESP a duty to promptly recommend payment of
those invoices, unless there was good cause to recommend otherwise.
Because Lemoine allegedly unjustifiably recommended that LCMH not pay
ESP invoices, but never recommended that ESP discontinue work on the
LCMH Project, Lemoine breached its duty to ESP, thereby causing
damages including lost revenue, lost business reputation, increased
financing costs, and lost profits on other projects. *Id.*, p. 18-19, ¶ 92-100.

**COUNT TWO: NEGLIGENCE.** ESP claims that Lemoine owed ESP a
duty to "follow professional standards" in reviewing invoices ServPro
submitted to LCMH and that Lemoine breached that duty in various ways
including breaching the applicable standard of care and professional
industry standards, causing ESP to incur the damages described above as
well as delay damages. *Id.*, p. 20-21, ¶ 101-110.

**B. ESP's third-party claims against DCMC**

ESP makes similar allegations against DCMC, which ESP describes as "primarily a FEMA

consultant on the LCMH Project." *Id.*, p. 16, ¶ 81.[3]  ESP alleges that LCMH retained DCMC, a

wholly-owned subsidiary of Lemoine, to provide "strategic planning support, operative and

financial recovery needs, and grant management" services, including consulting relating to

LCMH's FEMA claims.  *Id.*, p. 14, ¶ 72-73.  ESP also alleges that Lemoine and DCMC worked

"in tandem" to achieve their goals.  *Id.*, p. 15, ¶ 76.  DCMC's work included reviewing invoices

that ServPro submitted to LCMH to determine if they would be reimbursable by FEMA.  *Id.*, p.

14, ¶ 70-75.  ESP alleges that DCMC provided negligent advice to LCMH, including the advice

not to pay certain invoices because they were not reimbursable by FEMA or not adequately

supported by "back-up information."  *Id.*, p. 15, ¶ 80-85, 88-89.  LCMH allegedly followed this

advice and refused to pay certain submissions, including ESP's invoices.  *Id.*, p. 17, ¶ 86.

---

[3] ESP alleges that LCMH sought assistance from the Federal Emergency Management Agency ("FEMA") to recover for losses in excess of its insurance coverage.  Doc. 113, p. 3, ¶ 14.

ESP reasons that DCMC is responsible to ESP for ESP's damages under the same theories raised with respect to Lemoine as well as an additional "intentional tort" theory:

> **COUNT ONE: INTENTIONAL TORT.**  ESP claims that DCMC intentionally interfered with ESP's receipt of payment for its work on the LCMH Project by delaying its invoice review process, inadequately reviewing invoices, and recommending that LCMH refuse to pay invoices submitted by ServPro for ESP's work because those invoices were not reimbursable by FEMA.   In doing so, DCMC caused damages to ESP.  *Id.*, p. 22, ¶ 111-118.

> **COUNT TWO: NEGLIGENT PROFESSIONAL UNDERTAKING.** Echoing the claim against Lemoine, ESP alleges that DCMC owed a duty to ESP to  promptly recommend payment of ESP's invoices, unless there was good cause to recommend otherwise.  Because DCMC allegedly unjustifiably recommended that LCMH not pay ESP invoices, despite the fact that no contract made payment contingent on FEMA reimbursement, ESP alleges that DCMC intentionally or negligently breached its duty to ESP, thereby causing damages including lost revenue, lost business reputation, increased financing costs, and lost profits on other projects.  *Id.*, p. 23-24, ¶ 119-126.

> **COUNT THREE: NEGLIGENCE.**  Again echoing its similar claim against Lemoine, ESP claims that DCMC owed ESP a duty to "follow professional standards" in reviewing invoices ServPro submitted to LCMH and that DCMC breached that duty in various ways including breaching the applicable standard of care and professional industry standards, causing ESP to incur the damages described above as well as delay damages.  *Id.*, p. 25. ¶ 127-137.

**C.  Lemoine's and DCMC's basic response to ESP claims**

Lemoine and DCMC allege that ESP's third-party claims against them are not viable and seek dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

**II.**
**LAW AND ANALYSIS**

**A.  Legal Standard—Motion to Dismiss**

A motion filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure challenges the sufficiency of a plaintiff's allegations.  When ruling on a 12(b)(6) motion, the court accepts

the plaintiff's factual allegations as true and construes all reasonable inferences in a light most favorable to the plaintiff or nonmoving party. *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1960 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged [ . . . ] Determining whether a complaint states a plausible claim for relief [  . . . is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1949-50.

Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Id.* Courts will not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 129 S. Ct. at 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), the Fifth Circuit held that neither *Twombly* nor *Ashcroft* created a heightened pleading standard for complaints, and that these cases instead only "explicate" Rule 8(a)(2), particularly because *Twombly* recognized that pleading requirements could only be changed through amendment of the Federal Rules. *Id.* at 258-59 (citing *Twombly*, 127 S. Ct. at 1964-65, 1973 n. 14).

Accordingly, Rule 8(a)(2) continues to only require a "'short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)(quoting *Twombly*, 127 S. Ct. at 1959)(omissions original). This standard is met by the "reasonable inference" the court must make, with or without discovery, that the facts set forth a plausible claim for relief under a particular theory of law, provided there is a reasonable expectation that discovery will reveal relevant evidence of each element of the claim. *Lormand*, 565 F.3d at 257.

## B. Negligent Professional Undertaking

In seeking dismissal of ESP's negligent professional undertaking claims, Lemoine and DCMC acknowledge that Louisiana courts adopted a test defining that tort in *Colbert v. B.F. Carvin Const. Co*., 600 So. 2d 719, 725 (La. App. 5 Cir. 1992), *writ denied*, 604 So. 2d 1309 (La. 1992), *and writ denied*, 604 So. 2d 1311 (La. 1992). Describing the pleading standard as a "balancing test" that must be applied on a case-specific basis to determine if a defendant will be held liable to a third person not in privity, the *Colbert* factors direct the court to consider:

> the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct, and the policy of preventing future harm  [ . . . ]

*Colbert*, 600 So. 2d at 725 (quoting *Westerhold v. Carroll*, 419 S.W.2d 73 (Mo. 1967)).

Focusing on the allegations of negligently-performed billing review work, ESP argues that its third-party demand easily satisfies these factors because it complains that Lemoine and DCMC undertook that work with the express purpose of creating cost savings for LCMH by recommending that certain subcontractor's invoices not be reimbursed. ESP argues, therefore,

that the *Colbert* factors are satisfied:  1) the billing review work was "intended to affect" subcontractors such as ESP by modifying the amounts they would recover for their work; 2) the economic harm to ESP from recommendations not to pay invoices would have been highly foreseeable; 3) there is a direct relationship between third-party defendants' conduct and ESP's resulting economic losses because LCMH followed their advice to withhold payment on certain invoices; 4) the recommendations were allegedly made arbitrarily, without notice to ESP that FEMA reimbursement would be a condition of payment, and in third-party defendants' self-interest and, therefore, involve moral blame; and 5) this unfair manner of billing review practice should discouraged as a matter of public policy.  Doc. 137, p. 15-19; Doc. 154, p. 10-13.  Additionally with regard to Lemoine, ESP argues that "Lemoine did not direct Olson/ServPro to remove the generators even though Lemoine was fully aware of the prices being charged for the generators and was simultaneously advising LCMH not to pay these prices."  Doc. 154, p. 12.

In moving to dismiss ESP's third-party demands, Lemoine and DCMC urge the court to consider the context in which the tort of negligent professional undertaking was developed and find that the allegations here present a different set of circumstances from what is normally seen in negligent professional undertaking cases.  Doc. 129, 134.  The typical negligent professional undertaking case[4] considers whether architects and engineers on construction projects could be held liable to contractors or subcontractors who relied on their substandard drawings, supervision, or other professional services to their detriment, negatively impacting the contractors' ability to

---

[4] The defendant in a negligent professional undertaking case is typically an architect or engineer on a large construction project, but not always.  *See, e.g., Harris Builders, L.L.C. v. URS Corp.*, 861 F. Supp. 2d 746, 752 (E.D. La. 2012) (holding that the complaint stated a claim for negligence or negligent professional undertaking against defendant construction manager).  The plaintiff is typically a contractor who relied on the architect's or engineer's specifications, but not always.  See, e.g., *Hartford Cas. Ins. Co. v. Teche-Vermilion Fresh Water Dist.*, No. CV 6:19-0127, 2019 WL 7476712, at *1 (W.D. La. Dec. 16, 2019), *report and recommendation adopted*, 2020 WL 54102 (holding that the general contractor's surety stated a cause of action against a resident engineer, over the latter's objections that it operated primarily as an agent of the project owner).

timely or properly fulfill their own contractual duties. *See, e.g.*, *Colbert*, 600 So. 2d at 724–25 (discussing cases in which courts determined that it would be foreseeable for a subcontractor to be harmed by negligent preparation of instructions intended to guide his work); *S.K. Whitty & Co. v. Laurence L. Lambert & Assocs.*, 576 So. 2d 599, 601 (La App. 4 Cir. 1991), *writ denied*, 580 So. 2d 928 (La. 1991) (holding that plaintiff stated a valid cause of action "by alleging in its petition that the defendants failed to exercise the standard of care normally exercised by reasonable and prudent engineers in preparing plans, drawings and specifications for the project."); *Gurtler, Hebert & Co. v. Weyland Mach. Shop, Inc.*, 405 So. 2d 660, 662 (La. App. 4 Cir. 1981), *writ denied*, 410 So. 2d 1130 (La. 1982) (rejecting the argument that the architect owed a duty only to the project owner, where a subcontractor alleged that the architect failed to provide adequate and timely plans and specifications, leading subcontractor to make delays and cost overruns complained of by general contractor in main demand).

In large part, Lemoine's and DCMC's arguments favoring dismissal emphasize that, in the typical negligent professional undertaking case, the defendant exercises some control over the plaintiff and the plaintiff relies on the defendant's substandard work to his detriment. Lemoine and DCMC argue that the implied but essential elements of control and reliance are missing from this case because there is no allegation that either Lemoine or DCMC directed ESP's work or that ESP relied on DCMC's or Lemoine's instructions. Doc. 144, p. 2-4; doc. 159, p. 2-3. Both Lemoine and DCMC quote the same language from *Colbert* in making this point:

> **Altogether too much control over the contractor necessarily rests in the hands of the supervising architect** for him not to be placed under a duty imposed by law to perform without negligence his functions as they affect the contractor. **The power of the architect to stop the work alone is tantamount to a power of economic life or death over the contractor**. It is only just that authority, exercised in such a relationship, carry commensurate legal responsibility.

*Colbert*, 600 So. 2d at 724 (internal quotations omitted, emphasis added).  ESP looks to the same reasoning to argue that the exercise of economic power—such as the power exercised by Lemoine and DCMC in reviewing invoices containing ESP's billing submissions—is sufficient to give rise to the duty described in *Colbert*.  Doc. 137, p. 19.

### 1.  *Negligent Professional Undertaking claim against DCMC*

We disagree with ESP that the sort of economic control exercised by DCMC in reviewing ESP's billing submissions is sufficient to give rise to a claim for negligent professional undertaking.  *Colbert* directs courts to analyze on a case-by-case basis whether a cause of action exists on the facts plead.  *Id.*  The court finds that, on the facts plead here regarding DCMC's activities, the relationship between ESP and DCMC is distinct from the type of relationships that give rise to negligent professional undertaking claims.  Although ESP alleges that DCMC's billing review work harmed ESP economically, there is no allegation that DCMC controlled ESP's work, had the power to stop work on the LCMH project, or had the power to alter ESP's course of conduct at all—factors typically present in negligent professional undertaking claims that underly the legal duty discerned by *Colbert*.  DCMC urges that "DCMC's involvement was not to design, supervise or direct, conduct surveys, or prepare plans or contract documents upon which ESP would rely," and ESP makes no allegations to this effect.  Doc. 144, p. 3.  It would strain the tort of negligent professional undertaking beyond recognition to find that DCMC's billing review work gave rise to legal responsibilities akin to those of the architect in *Colbert*.

We therefore recommend that, based on the allegations in the third party demand, when taken as true and in the light most favorable to the claimant, DCMC's motion to dismiss should be **GRANTED** as to ESP's claims for negligent professional undertaking.

### 2. *Negligent Professional Undertaking claim against Lemoine*

Although many of ESP's allegations against Lemoine are similar to ESP's allegations against DCMC, ESP also alleges that Lemoine directed general contractor ServPro's work.  Doc. 113, p. 9, 15, ¶ 47.  There is, therefore, an allegation that Lemoine exercised control over the LCMH Project in its role as project manager, analogous to *Harris Builders, L.L.C. v. URS Corp.*, 861 F. Supp. 2d 746, 752 (E.D. La. 2012) (holding that the complaint stated a claim for negligence or negligent professional undertaking where its "gist" was that the defendant construction manager owed a duty to "manage the construction project in a way that would allow [plaintiff] to perform its own contractual duties owed to the Owner.").  ESP also pleads something akin to detrimental reliance on Lemoine.  ESP alleges that Lemoine knew early on that ServPro's daily "burn rate" was $220,000 and that the LCMH Project's cost would exceed its insurance coverage, but that Lemoine never "demobilized" subcontractors or informed them that their charges would be challenged in the way they were later challenged.  Doc. 113, p. 7, ¶ 37-43, 52.[5]  Put differently, ESP alleges that Lemoine caused LCMH to continue to accept the benefits of ESP's services and equipment, without intending to pay what they knew ESP intended to charge for those services.  Doc. 113, p. 8, ¶ 40-41.  We find that the *Colbert* test is satisfied here and that ESP states a negligent professional undertaking claim as to Lemoine, insofar as it alleges that Lemoine, with the capacity to direct and stop work on the LCMH Project, knowingly caused LCMH to accept the benefits of ESP's services while intending to advise LCMH not to reimburse ESP for those services.

---

[5] ESP also alleges that "DCMC negligently advised LCMH to allow Olson and its downstream vendors, including InPwr and ESP, to continue to provide services and equipment to LCMH while simultaneously advising and assisting LCMH in luring Olson into the belief that LCMH would actually enter into a written contract with Olson."  Doc. 113, p. 15, ¶ 78.  But there is no allegation that DCMC had the power to stop work on the project.

We find, and recommend that the district court agree that, based on the allegations in the third party demand, when taken as true and in the light most favorable to the claimant, Lemoine's motion to dismiss should be **DENIED** as to ESP's claims for negligent professional undertaking against Lemoine.

### C.  Negligence

ESP also brings general negligence clams against Lemoine and DCMC.  Doc. 113, p. 20-22, 25-26.

Article 2315 of the Louisiana Civil Code establishes a general cause of action for negligence: "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  La. Civ. Code. art. 2315(a).  In determining whether to impose liability under article 2315, Louisiana courts generally employ a duty-risk analysis, whereby a plaintiff must establish the following five elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

*Audler v. CBC Innovis Inc.*, 519 F.3d 239, 249 (5th Cir. 2008).

With respect to DCMC, ESP argues that it alleged 1) that DCMC owed ESP a duty of care to review and recommend payment of ESP's invoices, with a duty of care dictated by the applicable professional standards and ordinary prudence, 2) that DCMC breached that duty by failing to timely recommend payment without sound justification, 3) that ESP suffered damages, including lost revenue, as result of the breach, and 4) that the breach was the proximate cause of those damages.  Doc. 137, p. 21-22.

With respect to Lemoine, ESP makes similar allegations, but also alleges that "Lemoine repeatedly failed to provide necessary direction, answers and information required by it due to its position as the project manager, consultant, and/or agent of LCMH." Doc. 113, p. 20, ¶ 106; Doc. 154, p. 14.

DCMC and Lemoine argue that ESP has plead insufficient facts to establish that they owed ESP a legal duty sufficient to support a negligence claim, whether styled "negligence" or "negligent professional undertaking." Doc. 129, att. 1, p. 9-10; Doc. 134, att. 1, p. 4.

Under Louisiana law, "[a] threshold issue in any negligence action is whether the defendant owed the plaintiff a duty." *Audler*, 519 F.3d at 249. "Duty is a question of law." *Faucheaux v. Terrebonne Consol. Gov't*, 615 So. 2d 289, 292 (La. 1993).

> Simply put, the inquiry is whether a plaintiff has any law—statutory, jurisprudential, or arising from general principles of fault—to support the claim. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. When no factual dispute exists and no credibility determinations are required, the legal question of the existence of a duty is appropriately addressed by summary judgment.

*Lathan Co., Inc. v. State, Dep't of Educ., Recovery Sch. Dist.*, 2016-0913 (La. App. 1 Cir. 12/6/17), 237 So. 3d 1, 6, *writ denied* 237 So. 3d 1191 (La. 2018).

Here, Lemoine and DCMC do not argue that they are bound by no relevant duty. Rather they argue that ESP has not plead a sufficient basis to show that DCMC or Lemoine owed a duty *to* ESP. In doing so, they raise a mixed question of law and fact that is assessed in the duty-risk analysis under the "legal cause" element (*i.e.*, the scope of liability or scope of protection element). *See Chatman v. S. Univ. at New Orleans*, 197 So. 3d 366, 375 (La. App. 4 Cir. 2016). Although duty itself is a question of law, "the Louisiana Supreme Court confirmed that legal cause is a mixed question of law and fact for the jury (or other fact-finder) to decide." *Id.* (citing *Parents of Minor*

*Child v. Charlet*, 135 So. 3d 1177, 1181 (La. 2014); *see also Charlet*, 135 So. 3d at 1181 ("[w]hether this particular priest owed this particular duty to the plaintiffs in this particular factual context is a mixed question of law and fact.")).

Finding this mixed question of law and fact inappropriate for resolution on a motion to dismiss, we recommend that the motions to dismiss be **DENIED** as to ESP's negligence claims against Lemoine and DCMC.

### D. Intentional Tort

DCMC also moves to dismiss ESP's "intentional tort" claim. Doc. 129, att. 1, p. 6-8. DCMC bases its motion on the assumption that ESP must be trying to assert a claim for tortious interference with contractual relations, and DCMC argues that ESP fails to do so by neglecting to plead one or more elements of that offence. Doc. 129, att. 1, p, 7.[6] ESP argues in response that it intended to set forth a claim against DCMC[7] for intentional interference with business relations, not intentional interference with contract. Doc. 137, p. 8, 17.

Under Louisiana law, to bring a successful cause of action for tortious interference with business relations, a plaintiff must show that the defendant:

    (1) "acted with actual malice";

    (2) "actually prevented the plaintiff from dealing with a third party";

    (3) acted "improperly," i.e., not to "protect legitimate interests"; and

    (4) caused damage to the plaintiff.

---

[6] Specifically, DCMC finds the claim deficient in that it is not alleged against a corporate officer, there is no contractual or legally protected interest between ESP and DCMC, and ESP fails to plead the absence of justification by setting forth facts that would, in fact, justify DCMC's actions. Doc. 129, att. 1, p. 7-8. We do not address these elements because ESP has clarified that it did not intend to state a claim for intentional interference with contract.

[7] In its opposition briefing, ESP emphasizes that the only entity against which it raises an intentional tort claim is DCMC [doc. 154, p. 17], mooting Lemoine's preemptive arguments that ESP has not stated a claim for an intentional tort against Lemoine. *See* doc. 134, att, 1, p. 5-6.

*IberiaBank v. Broussard*, 907 F.3d 826, 841 (5th Cir. 2018) (internal footnotes omitted)(quoting *Bogues v. Louisiana Energy Consultants, Inc.*, 71 So. 3d 1128, 1135 (La. App. 2 Cir. 2011); *Henderson v. Bailey Bark Materials*, 116 So. 3d 30, 37 (La. App. 2 Cir. 2013)).

ESP argues that it states a cause of action under this theory by alleging that DCMC "intentionally recommended that LCMH withhold payment associated with ESP under the pretense that those costs were non-reimbursable by FEMA. ESP also alleged that DCMC's intentional delay in reviewing invoices, failure to adequately review invoices, and failure to provide any legitimate basis for the denial of payment caused damages to ESP." Doc. 137, p. 23.

In reply, DCMC notes that the third-party complaint fails to make adequate allegations as to the first three elements. As to the first element, which requires "actual malice,"[8] DCMC states that this element is not adequately plead because "ESP did not allege, in any context, that DCMC acted with malice, spite or ill will or was motivated by bad feelings." Doc. 144, p. 9 (citing doc. 113; ¶ 81-85). As to the second element, preventing plaintiff from dealing with a third party,[9] DCMC argues that "ESP made no allegations that ESP was actually prevented from dealing with LCMH, simply that LCMH did not pay Olson, who did not pay InPwr, who did not pay ESP." Doc. 144, p. 9 (citing doc. 113, p. 26-32). As to the third element, which requires that defendant acted "improperly, rather than to protect legitimate interests," DCMC argues that "ESP specifically alleged DCMC was motivated by profit[.]" Doc. 144, p. 9 (citing doc. 113, ¶ 82). ESP does not address these arguments in its sur-reply. Doc. 150.

---

[8] *See Bogues v. Louisiana Energy Consultants, Inc.*, 46,434 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1128, 1135 (holding that allegations "fall short of the malice, ill will or spite element that must be pleaded in the petition to sufficiently state a cause of action for tortious interference with business.").

[9] "Significantly, it is not enough to allege that a defendant's actions affected plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party." *Bogues v. Louisiana Energy Consultants, Inc.*, 46,434 (La. App. 2 Cir. 8/10/11), 71 So. 3d 1128, 1135.

We agree with DCMC's assessment and recommend that the district court find that ESP has failed to state a claim against DCMC for intentional interference with business relations under Louisiana law.  Accordingly, we recommend that DCMC's motion to dismiss be **GRANTED** with respect to Count One of ESP's claims against DCMC, labeled "Intentional Tort."

### III.
### CONCLUSION

For the reasons stated, **IT IS RECOMMENDED** that the Fed. R. Civ. P. Rule 12(b)(6) motion to dismiss brought by the Lemoine Company, LLC [doc. 134], seeking dismissal of the third-party demands of Expedited Service Partners, LLC [Doc. 113] be **DENIED**;

**IT IS FURTHER RECOMMENDED** that the Fed. R. Civ. P. Rule 12(b)(6) motion to dismiss brought by DCMC, LLC a/k/a DCMC Partners [doc. 129] be **GRANTED IN PART** such that Count One "Intentional Tort" and Count Two "Negligent Professional Undertaking" of the third-party demands of Expedited Service Partners, LLC [Doc. 113] against DCMC be dismissed with prejudice;

**IT IS FURTHER RECOMMENDED** that DCMC's Motion to Dismiss [doc. 129] be otherwise **DENIED.**

Under the provisions of 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure, parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District

Court, except upon grounds of plain error. *See Douglas v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429-30 (5th Cir.1996).

THUS DONE AND SIGNED in Chambers this 2nd day of November, 2022.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE